DENISE ANDERSON, WILLIAM ANDERSON, ROBERT W. CASTLE, ARLENE LATKO, JOEL MYRON, ADRIAN TENHOR AND JERSEY CITY BRANCH OF NAACP, INDIVIDUALLY AND ON BEHALF OF THOSE PERSONS AND ORGANIZATIONS SIMILARLY SITUATED, PLAINTIFFS-RESPONDENTS, v. ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, DEFENDANT-APPELLANT, AND STEVEN NESTOR, POLICE CHIEF OF JERSEY CITY, GEORGE N. BONNELLI, SHERIFF OF HUDSON COUNTY, AND GEORGE WHELAN, POLICE DIRECTOR OF JERSEY CITY, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AND AS REPRESENTATIVES OF THE CLASS OF POLICE CHIEFS, COUNTY SHERIFFS, MUNICIPAL, COUNTY AND STATE LAW ENFORCEMENT OFFICIALS OF NEW JERSEY, DEFENDANTS.

Argued February 3, 1970—Decided June 1, 1970.

212

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellant (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

*Mr. Morris Stern* argued the cause for respondents (*Mr. L. Walter Finch, Mrs. Muriel Finch, Mr. Frank Askin,* and *Mr. Arthur D'Italia,* on the brief; *Mr. Stephen M. Nagler, Mr. Melvin Wulf* and *Mrs. Eleanor Norton,* of counsel).

*Mr. J. Gordon Zaloom* and *Mr. Jeffrey E. Fogel,* of Newark Legal Services Project, *Mr. William J. Bender, Mr. Edward Carl Broege, Mr. Arthur Kinoy, Mr. William M. Kunstler, Mr. Michael Sayer, Mr. Benjamin E. Smith, Mr. Morton Stavis, Miss Nancy Stearns,* and *Mr. Peter Weiss,* of Law Center for Constitutional Rights, New York, and *Mr. Jack Wysoker,* for New Jersey SANE, submitted a brief for *amici curiae* Newark Legal Services Project, Law Center for Constitutional Rights, and New Jersey SANE.

*Mr. Daniel F. Gilmore* entered an appearance for Hudson County.

*Mr. Francis X. Hayes* entered an appearance for the City of Jersey City.

The opinion of the court was delivered by

WEINTRAUB, C. J. This is a declaratory judgment suit brought as a class action against the Attorney General and local law enforcement officials, also as a class. The complaint alleges violation of plaintiffs' First Amendment rights of speech and association. The complaint revolves about a

memorandum, entitled "Civil Disorders — The Role of Local, County and State Government" (herein Memorandum), prepared by the Attorney General of the State and sent to local law enforcement officials. The trial court denied the Attorney General's motion to dismiss the complaint for failure to state a claim for relief and granted plaintiffs' motion for summary judgment. *Anderson v. Sills,* 106 *N. J. Super.* 545 (Ch. Div. 1969). The Attorney General appealed and we certified the matter before argument in the Appellate Division.

## I

The record made on the motion for summary judgment was exceedingly sparse. After the trial court's decision, the Attorney General moved with supporting affidavits for reconsideration and for leave to file an answer. The trial court, concluding that its views were not altered by the proof thus tendered, denied the motion for reconsideration but did order that the answer and affidavits be filed *nunc pro tunc* as of the time of the argument of the motion for summary judgment.

The record was thus enlarged, but in our view it remained inadequate for a decision upon the merits. The constitutional issue was presented in a hypothetical way within an aura of surmise and speculation. The trial court should have refused to decide it on a motion for summary judgment. That this is so will appear from what follows.

In 1967 there were a number of civil disorders in our State including some costly riots. The Memorandum, as its caption suggests, deals with that subject. It was sent to all local police units on April 23, 1968, following a conference between the Governor and the mayors of the municipalities of the State.

The Memorandum is not a regulation, or a directive, or an order. It is simply a communication from the Attorney General to independent local law enforcement units, all outside the Attorney General's official chain of command. The

Memorandum is basically informational.[1] It deals with the role of local, county, and State governments with respect to civil disorders.

The Memorandum suggests guidelines based upon the intensity of the disorders and the ability of the municipality to cope with them. It describes the primary duty of each municipality, the basis for a call upon neighboring municipal and county resources, the basis for a call for limited State Police assistance, and finally the basis for State intervention. It recommends advance planning as to each of the stages just mentioned and in comprehensive fashion discusses the problems to be anticipated and the facilities and resources available.

Virtually at the end of the Memorandum appears the following statement which plaintiffs stress:

POTENTIAL PROBLEMS

Our State Police have been working closely with local police in various communities throughout the State in a continuing effort to

---

[1] The Memorandum opens with the following statement:

This document is submitted in order to provide local officials with information concerning the legal and practical ramifications of handling civil disorders It has been developed as a general procedural guideline for the handling of civil disorders with recognition, however, that each specific situation may require some variation depending upon the particular circumstances and needs, as well as the governmental and physical structure of each municipality. Since there are 567 municipalities in New Jersey, it must be recognized that no single plan of action could be prescribed in advance to cover every aspect of each local area where a civil disorder may occur. Further, each of the various municipalities has different requirements and problems with which they must deal.

In critical areas, our State Police have been coordinating for some time with local officials who are already familiar, in substance, with what is contained in this document. Some differences may be noted here, but these are due to the constant re-appraisal and modifications which are a part of the planning process.

It is suggested, therefore, that you review the enclosed material with your staff, keeping in mind that the primary responsibility for planning, preparation and implementation in connection with civil disorders in your jurisdiction rests with the local governing body.

While this material serves as a guideline, this office and the New Jersey State Police are available to assist you with specific problems

keep abreast of potential civil disorder problems. In that respect therefore, we are already familiar generally with basic problems in these communities. However, these problems change and we should never become over confident to the end that we lose sight of the cause, as well as the effect of civil disturbances. The State Police Central Security Unit has distributed Security Summary Reports (Form 421) and Security Incident Reports (Form 420) (see Appendix G) to each police department. It is necessary that these reports be used routinely to inform the State Police of the situation in your community. We urge you to see that this vital intelligence is communicated to this central bureau for evaluation and dissemination.

Plaintiffs say the Memorandum will result in police invasion of their First Amendment rights and build that complaint upon the content of forms 420 and 421 and the instructions for their preparation contained in "Appendix G" of the Memorandum. That appendix, including the forms, is reproduced at the end of this opinion.

Form 420 calls for a report of an "incident." As the instructions related to the form explain, the "incident" may be "anticipated" or "in progress" or "completed." The form calls for a statement of the "type" of incident and the instructions give as *"Examples*: Civil disturbance, riot, rally, protest, demonstration, march, confrontation, etc." The form calls for the names of the organizations or groups involved in the "incident," and the instructions suggest as *"Examples of types*: Left wing, Right wing, Civil Rights, Militant, Nationalistic, Pacifist, Religious, Black Power, Ku Klux Klan, Extremist, etc." and as *"Examples of How Involved*: Sponsor, co-sponsor, supporter, assembled group, etc."

Form 421 relates to an individual, as distinguished from an incident. Among the instructions appear: *"Spouses Full Name* — Type full name of spouse. If wife, include maiden name or names by any other marriages," and *"Associates* — Enter names and addresses of associates, include aliases and nicknames. List additional associates in Narrative." The "Narrative" portion of the form reads: "citizenship/naturalization data — parental background/occupation — armed forces service/draft status — membership, affiliation

and/or status with organizations or groups — education background — habits or traits — places frequented — parole/probation data — data on immediate family — financial/credit status — include other record of past activities, findings and/or observations."

On the basis of the several items we have just collated, plaintiffs envision that a mere rally, protest, demonstration or march of a pacifist group will precipitate a police dossier of everyone who attends, including therein his butcher's and banker's opinion of his credit. Adverting then to the portion of the Memorandum quoted above which says it is "necessary that these reports be used routinely to inform the State Police of the situation in your community" and urges that the intelligence be communicated "to this central bureau for evaluation and dissemination," plaintiffs enlarge upon their hypothetical horribles and see each such citizen harried amid his family, friends, and business associates. There is not an iota of evidence that anything of the kind has occurred or will, or that any person has been deterred by that prospect.

The individual plaintiffs themselves do not claim to have been deterred. In their affidavits on the motion for judgment, one plaintiff says she is chairman of the Students for a Democratic Society at St. Peter's College, and as an example of her activity she tells of "a sit-in at the office of the President." She adds that during a student strike which followed, "pickets were photographed by two men in plain clothes in an unmarked car" but there is no evidence as to their identity.[2] The husband of that affiant says he has participated in a number of marches, rallies, and protests in opposition to the Viet Nam war, in support of burners of draft cards, and in protest of some alleged "racist policies" of a large religious organization. He adds that he hopes to be a lawyer and fears the Memorandum "may hinder my chances at being accepted

---

[2] The State Police affirmatively disclaim any knowledge of the photographing incident.

at the law school of my choice"; that although "I have thus far not been deterred from exercising my First Amendment rights by the existence of the aforesaid memorandum, its existence is a factor which I must weigh in deciding whether or not to speak or act on a particular occasion;" and that "as an organizer of rallies, marches, protests and demonstrations, I feel that I must warn potential participants that, pursuant to the Attorney General's Memorandum they are subject to being investigated and classified by the police despite the lawfulness of our activity." Another affiant says she is a member of an urban renewal association and has picketed in support of its aims and as well against some alleged "racist policies" of the religious organization already referred to, but she says that she feels "the existence of the memorandum may deter me from exercising my First Amendment rights in the future." She says she is "particularly concerned lest a police investigation such as that directed by the memorandum lead my landlord to believe that I had done something illegal." Another affiant describes his activities, including picketing of police headquarters, a stand-in at a bank, a sit-in at a mayor's office, and the distribution of anti-war leaflets and peace marches. He says "I cannot say that I will be deterred in the future from exercising my First Amendment rights" but he believes that "police surveillance, investigation, and cataloguing, and * * * disseminating the garnered information" may jeopardize his right to associate with others "should my activities become subject to the Attorney General's memorandum." The final affiant, the president of the Jersey City Branch of the NAACP, says that "once our organization and its members are investigated and categorized as per the memorandum, other persons in the community who are potential supporters * * * will disassociate themselves from any NAACP activity and a valuable audience will be lost."

The foregoing is a resume of the record upon which the trial court held that the portion of the Memorandum we quoted above, entitled "Potential Problems," and forms 420

and 421 violate the First Amendment, and granted sweeping injunctive relief we will discuss later in this opinion. There was no evidence that the Memorandum was intended or has been read by local police officials to call for any action which invades a constitutionally protected area. There was no evidence that the Attorney General intended to intimidate anyone. Nor does it appear that he even sought to publicize the use of these forms. Indeed, according to the affidavit of Lieutenant Goch of the State Police submitted on the motion for reconsideration, there is no form 420 or 421 as to any of the plaintiffs, and there is no index file on any of them except one, and as to him only because of an arrest record going back to 1963.

## II

Defendants contend that since plaintiffs have not been harmed they lack "standing" to sue. We do not require that injury shall be experienced as a condition for suit, *State v. Baird,* 50 *N. J.* 376, 378 (1967), and there is good reason to permit the strong to speak for the weak or the timid in First Amendment matters. Nonetheless the prospect of wrongful conduct must be real and not fanciful, *Grand Union Co. v. Sills,* 43 *N. J.* 390, 409-411 (1964); *Burton v. Sills,* 53 *N. J.* 86, 92 (1968), appeal dismissed, 394 *U. S.* 812, 89 *S. Ct.* 1486, 22 *L. Ed.* 2d 748 (1969), for the chance of error is substantial if an issue is accepted in a setting that is merely hypothetical. *Golden v. Zwickler,* 394 *U. S.* 103, 89 *S. Ct.* 956, 22 *L. Ed.* 2d 113 (1969); *United Public Workers of America (C. I. O.) v. Mitchell,* 330 *U. S.* 75, 89–90, 67 *S. Ct.* 556, 91 *L. Ed.* 754, 767 (1947). Especially is this so when the decision depends upon striking a balance between competing constitutional values.

In this connection it is important to note what is and is not before us. We are not dealing with a statute imposing criminal liability for its violation, as in *United States v. Robel,* 389 *U. S.* 258, 88 *S. Ct.* 419, 19 *L. Ed.* 2d 508

(1967); *Dombrowski v. Pfister,* 380 *U. S.* 479, 85 *S. Ct.* 1116, 14 *L. Ed.* 2d 22 (1965); *Gibson v. Florida Legislative Investigation Committee,* 372 *U. S.* 539, 83 *S. Ct.* 889, 9 *L. Ed.* 2d 929 (1963); *NAACP v. Button,* 371 *U. S.* 415, 83 *S. Ct.* 328, 9 *L. Ed.* 2d 405 (1963); *Watkins v. United States,* 354 *U. S.* 178, 77 *S. Ct.* 1173, 1 *L. Ed.* 2d 1273 (1957), or a statute which affects the right to public employment, *Keyishian v. Board of Regents of New York,* 385 *U. S.* 589, 87 *S. Ct.* 675, 17 *L. Ed.* 2d 629 (1967), or to pursue a profession, *Konigsberg v. State Bar of California,* 336 *U. S.* 36, 81 *S. Ct.* 997, 6 *L. Ed* 2d 105 (1961). Where a statute thus affects an individual, it may on its face invite the question whether because of vagueness or overbreadth it unnecessarily deters an individual from speech or activity protected by the First Amendment.

Here, the Memorandum imposes no liability or obligation or restriction whatever upon the citizen. Nor does it order the policeman to take action against a citizen upon the pain of discipline if the policeman does not comply. It is no more than a communication to law enforcement agencies about their respective powers and duties. It is wholly informative and advisory. It does not command; it merely encourages cooperation among all agencies concerned with the problem of civil disorders.

██ This is not to say that only statutes, regulations, or binding directives may spawn a First Amendment problem. But it would be unreasonable to require that intragovernmental communications be drafted with a precision the Constitution demands of a legislative enactment. The writer of the Memorandum could well assume the reader would be aware of the limitations of his office and would understand that the writer was not advocating anything arbitrary, oppressive, or foolish. The police are much too occupied for idle investigations. We think it preposterous to suppose that the Memorandum was intended or was understood to recommend round-the-clock surveillance of every person who attends an anti-war meeting.

██ When the Memorandum and forms 420 and 421 are read without strain, the common sense of the situation readily emerges. There have been serious disorders involving heavy losses of life and property. The police function is pervasive. It is not limited to the detection of past criminal events. Of at least equal importance is the responsibility to prevent crime. *State v. Dilley,* 49 *N. J.* 460, 464 (1967). In the current scene, the preventive role requires an awareness of group tensions and preparations to head off disasters as well as to deal with them if they appear. To that end the police must know what forces exist, what groups or organizations could be enmeshed in public disorders. This is not to ask the police to decide which are "good" and which are "bad." In terms of civil disorders, their respective virtues are irrelevant, for a group is of equal concern to the police whether it is potentially the victim or the aggressor. The police interest is in the explosive possibilities and not in the merits of the colliding philosophies. And it must be evident that a riot or the threat of one may best be ended with the aid of private citizens who because of their connections with the discordant groups can persuade them from a course of violence. Hence a police force would fail in its obligation if it did not know who could be called upon to help put out the burning fuse or the fire.

In the summer of 1967 there were serious riots. Both the President of the United States and the Governor of this State appointed commissions to study the problem and to make recommendations. The *Report of the National Advisory Commission on Civil Disorders* (March 1, 1968) in its "Supplement on Control of Disorders" encouraged the preparations which the Memorandum here involved seeks to achieve. It reads (*p.* 269):

INTELLIGENCE — The absence of accurate information both before and during a disorder has created special control problems for police. Police departments must develop means to obtain adequate

intelligence for planning purposes, as well as on-the-scene information for use in police operations during a disorder.

An intelligence unit staffed with full-time personnel should be established to gather, evaluate, analyze, and disseminate information on potential as well as actual civil disorders. It should provide police administrators and commanders with reliable information essential for assessment and decisionmaking. It should use undercover police personnel and informants but it should also draw on community leaders, agencies, and organizations in the ghetto.

In his affidavit accepted by the trial court on the motion for reconsideration, Lieutenant Goch of the State Police described the activities of its Central Security Unit. He stated in part:

At the present time information concerning crime and criminals is gathered by the intelligence unit in the Organized Crime Task Force in the New Jersey State Police and information concerning extremist organizations and incidents concerning disturbances arising out of racial, social and economic tensions is gathered by the central security unit, the human relations unit and the civil disturbance unit.

Specifically, some of the past and present reasons for the accumulation of information by the State Police are: (a) to aid in the evaluation and determination of the probability of unlawful disorders, large-scale violence, and potential riots; (b) to aid in the determination of supplemental police manpower needs; (c) to facilitate decisions and planning for coping with disorders anticipated or in progress; (d) to aid in the assessment of tension within communities and possible causes of unrest; (e) to aid in familiarization with the past activities of professional agitators, their tactics and control over their followings; and (f) to furnish information for meetings of the Governor with officials of various State Departments including the Department of Community Affairs, Department of Education, Department of Institutions and Agencies, Division on Civil Rights, Office of Attorney General, and Division of State Police for their study of the causes of civil disorder, so that this information can be used by the Governor and appropriate governmental agencies to alleviate present tensions and prevent future and potential disorders.

He pointed out that forms 420 and 421 were prepared prior to the Memorandum and were not devised for it. He emphasized that the forms deal with public incidents only, and are simply suggestive of the kinds of information the State Police believe should be on hand; that like informa-

tion had always been received through liaison with police agencies; that in fact most of the information called for in these forms can be obtained from newspaper clippings; that such information as appears with respect to these plaintiffs was received from news clippings or other agencies, rather than by way of these forms; that information from all sources is integrated, and is available to public agencies only on a "need-to-know basis," and is never available to private interests.

Other affidavits accepted on the motion for reconsideration spell out the measures taken to keep up with a fast-moving scene and to anticipate explosive situations. They repel the notion that the program was intended or has been used to harass anyone. An assistant to the Governor stated:

I have convened during the past year, as the Governor's representative, meetings held on a regular basis with officials of the Department of Community Affairs, Department of Education, Division of Civil Rights, Division of State Police, Division of Law and National Guard, the purpose of which is to review potential trouble-spots within the state, to discuss methods by which the state may respond to community tensions and civil disorder in a constructive manner, and to make contingency plans in the event disorders are threatened or occur.

One aspect of these meetings is the exchange of information concerning community tensions and potential trouble-spots amongst the officials of the various agencies represented.

The State Police have, for example, supplied information on occasion that a particular group would be holding a public meeting at a particular time and place and that a volatile situation could develop. Thereafter members of this agency and others contact these groups or mentioned leaders to avert the development of disorders.

The Director of the Division on Civil Rights added:

I have attended, during the past year, meetings held on a regular basis with the Governor or his representatives and officials of the Department of Community Affairs, Department of Education, Division of Law, Division of State Police and National Guard, at which we have reviewed potential trouble spots within the state and discussed both immediate and long-range measures by which the state may respond to existing community tensions and the underlying causes of urban problems in a constructive manner.

As Director of the Division on Civil Rights, I also direct members of my staff to submit reports concerning protests, demonstrations and other manifestations of tension and discord within the urban community. Sometimes, as a result of these reports and other information received by me, I contact representatives of organizations involved in protests, demonstrations, etc. to hear their grievances and to discuss possible ways of dealing constructively with the problems faced by the community.

It of course is not our purpose here to resolve a factual issue. We refer to the affidavits simply because on their face they assert a purpose to discharge a plain duty of government and thus confirm the purpose avowed in the Memorandum.

█ It is a serious matter for the judiciary to interfere with the preventive measures devised by the executive branch of government in response to its constitutional obligation to protect all the citizens. Surely, such interference may not rest upon a hypothetical exposition of what could happen under a set of forms in the hands of an officer indifferent to the restraints upon his office. Rather the premise must be accepted, absent proof the other way, that the Memorandum assumed a lawful exercise of the judgment and discretion vested in the local police. The Memorandum did not originate the duty of the local police unit to decide what situations harbor the potential of disaster and what data should be gathered for responsible performance in office. The forms do not enlarge upon that power and responsibility. Rather, being designed for many situations, the forms are necessarily comprehensive, leaving it to the local authorities to decide in their judgment what incidents are worthy of note and what information should be obtained as to the individuals concerned or involved.

█ Nor should an injunction issue on the assumption that there will be unwarranted police action because a judge cannot on the basis of his own experience understand the relevancy of the spouse's full name, or the employer's name, or of "armed forces service/draft status," or "data on

immediate family" or "financial/credit status," to mention some items plaintiffs stress in their academic attack. Law enforcement is a specialty, and its needs may not be within the expertise of a court. That is why a hearing is essential for an informed decision in a case of this kind. It may well be that a hearing will establish that some of these items are wholly unrelated to the police obligation with respect to anyone involved in any type of incident, but we should not merely assume that this is so. We cannot know how little we know until we listen.

## III

For these reasons the issue as projected by plaintiffs on the motion for summary judgment was a mere abstraction. The trial court should have denied the motion on that account. For the same reasons we will not deal with the merits. Nonetheless some observations may be helpful upon the remand.

 Here we are dealing with the critical power of government to gather intelligence to enable it to satisfy the very reason for its being — to protect the individual in his person and things. The question in the case is not merely whether there are some individuals who might be "chilled" in their speech or associations by reason of the police activity here involved. Rather the critical question is whether that activity is legal, and although the amount of "chill" might in a given case be relevant to the issue of legality, the fact of "chill" is not itself pivotal. Indeed, the very existence of this Court may "chill" some who would speak or act more freely if there were no accounting before us for trespassers against others. But government there must be, for without it no value could be worth very much. The First Amendment itself would be meaningless if there were no constituted authority to protect the individual from suppression by others who disapprove of him or the company he keeps. Hence the First Amendment rights must be weighed against the competing interests of the citizen. If there is

no intent to control the content of speech, an overriding public need may be met even though the measure adopted to that end operates incidentally to limit the unfettered exercise of the First Amendment right. *In re Marvin,* 53 *N. J.* 147, 152–153 (1969), *cert.* denied, 396 *U. S.* 821, 90 *S. Ct.* 62, 24 *L. Ed.* 2d 72 (1969). If a properly drawn measure is within the power of government, it is no objection that the exercise of speech or association is thereby "chilled." *Cameron v. Johnson,* 390 *U. S.* 611, 619, 88 *S. Ct.* 1335, 20 *L. Ed.* 2d 182, 189 (1968) ; *United States v. O'Brien,* 391 *U. S.* 367, 377, 88 *S. Ct.* 1673, 20 *L. Ed.* 2d 672, 680 (1968).

The power to investigate is basic. So the cases recognize a vast power to investigate in the legislative branch so long as the inquiry is relevant to the legislative function. *Watkins v. United States, supra,* 354 *U. S.* at 187, 77 *S. Ct.* at 1179, 1 *L. Ed.* 2d at 1284. An administrative agency may on its own initiative investigate to see that there is compliance with law within the ambit of its responsibility. *United States v. Powell,* 379 *U. S.* 48, 57, 85 *S. Ct.* 248, 13 *L. Ed.* 2d 112, 119 (1964). So, too, a grand jury may inquire as to whether a crime occurred and who was the culprit, and its power to compel testimony does not depend upon the existence of "probable cause" either as to the fact of a crime or the culpability of the suspect. *In re Addonizio,* 53 *N. J.* 107, 123–127 (1968).

The investigatory obligation of the police is surely no less extensive than the grand jury's. Indeed, the preventive role of the police necessarily implies a duty to gather data along a still wider range. The "stop-and-frisk" rule rests upon that preventive duty, see *State v. Dilley, supra,* 49 *N. J.* at 464, and *Terry v. Ohio,* 392 *U. S.* 1, 22–23, 88 *S. Ct.* 1868, 20 *L. Ed.* 2d 889, 906–907 (1968). There is the power of surveillance. It includes even the deceptive use of undercover agents to infiltrate situations in which criminal events have occurred or may be anticipated. *Lewis v. United States,* 385 *U. S.* 206, 87 *S. Ct.* 424, 17 *L. Ed.* 2d 312 (1966); *Hoffa v. United States,* 385 *U. S.* 293, 87 *S. Ct.* 408, 17 *L.*

*Ed.* 2d 374 (1966); *Osborn v. United States,* 385 *U. S.* 323, 87 *S. Ct.* 429, 17 *L. Ed.* 2d 394 (1966). And electronic surveillance of a public meeting has been sustained. *United States v. Tijerina,* 412 *F.* 2d 661 (10 Cir. 1969), *cert.* denied, 396 *U. S.* 990, 90 *S. Ct.* 478, 24 *L. Ed.* 2d 452 (1969).

No doubt there may be situations in which judicial intervention would be warranted. One court intervened when it found the police surveillance was conducted in a manner which was unnecessarily obtrusive and unnecessarily interfered with legitimate business activity, *Bee See Books, Inc. v. Leary,* 291 *F. Supp.* 622 (S. D. N. Y. 1968), and another enjoined surveillance of a private meeting of a labor union when the presence of the police was manifest and operated to prevent free discussion, *Local 309, etc. v. Gates,* 75 *F. Supp.* 620 (N. D. Ind. 1948). But the power of surveillance is so imperative that even though it was found in *United States v. McLeod,* 385 *F.* 2d 734 (5 Cir. 1967), that the police illegally intended by sham arrests and baseless prosecutions to frustrate the right to vote of a racial minority and should be enjoined in those respects, nonetheless the court would not restrain police surveillance of public meetings, saying (*p.* 750):

We turn next to the surveillance of the public meetings. The Government argues that the only possible reason for the presence of deputies at the meeting was to intimidate potential Negro voters. The defendants insist that they sent the deputies to the meetings solely to preserve order and to protect the Negroes.

We recognize that surveillance of meetings may tend to deter the exercise of federally guaranteed rights. N. L. R. B. v. Friedman-Harry Marks Clothing Co., 1937, 301 U. S. 58, 57 S. Ct. 645, 81 L. Ed. 921. We cannot agree with the government, however, that the defendants' explanation of the deputies' mere presence at the meetings was so incredible as to require the trial judge to draw the inference that the real motive was intimidation or coercion. In the explosive situation prevailing in Selma in 1963, it would have been a dereliction of duty for the county not to have provided law enforcement coverage of these mass meetings. While the presence of the deputies may have had an incidental coercive effect, there was evidence of a legitimate motive. We cannot find the district judge clearly erroneous on this score.

██ The basic approach must be that the executive branch may gather whatever information it reasonably believes to be necessary to enable it to perform the police roles, detectional and preventive. A court should not interfere in the absence of proof of bad faith or arbitrariness. As we said in *Addonizio, supra,* 53 *N. J.* at 134–135:

> It may be assumed that a court would protect against abuse by investigation as it would protect against any other arbitrary behavior in office. But we think it fitting to stress the need for broad power in the police and the grand jury to probe widely for evidence of crime. This power is all the more vital today because the ability of the police to go directly to the suspect or his property for evidence of guilt has been significantly limited by a run of decisions. The State is therefore remitted to more extensive surveillance and circumstantial investigation.

We are not unmindful of the unfortunate polarization within our society, and we can understand how in that light some may fear that officials will unlawfully take sides. Yet, to deny to government, on that account, the authority it must have to fulfill its mission would heighten that fear or even make it a reality. Lawlessness has a tyranny of its own, and it would be folly to deprive government of its power to deal with that tyranny merely because of a figment of a fear that government itself may run amuck. It should be remembered, too, that our form of government has a built-in safeguard against tyranny in office. The total power of government is divided among the three branches to prevent despotic behavior within any of them. The delicate balance would be upset if the judiciary interfered with another branch upon nothing more than a fear that its officers will be unfaithful to their oaths or unequal to their responsibility. A public official who intentionally turns his office to an arbitrary end is already accountable under the criminal law for such misconduct. It will be time enough for a court to act injunctively when the threat of misbehavior is real.

 Finally, a word about the judgment itself. It of course will be set aside for the reasons already given but the injunctive relief nonetheless warrants comment. The judgment restrained the further use of forms 420 and 421 and ordered and adjudged that

4. The Attorney General produce and destroy all forms 420 and 421 submitted pursuant to the aforementioned memorandum, and files and information of record connected therewith and discernibly derived from the referenced forms, concerning the activities of plaintiffs and others similarly situated, except where such information will be used to charge persons with specifically defined criminal conduct.

It was in any event improper to limit the files of the State Police to "such information [as] will be used to charge persons with specifically defined criminal conduct." As we have said, the police have a preventive role; its intelligence may not be confined to past criminal events, and even there the police may not be limited to information which constitutes the basis of the criminal charge itself. Moreover, it is not clear at the moment why the focus should be upon information obtained from forms 420 and 421. If the State Police are collecting information in violation of the Constitution, it cannot matter whether the information comes from those forms or some other source. In other words the relief, if any should be warranted, should identify the material found to be forbidden. And so, too, if it should be found that the forms are vulnerable only because some data they seek are beyond the lawful interest of the police, the restraint must be limited to the offensive matter. To strike from the files information the State Police should have, merely because other information ought not to be there, can serve only to deny the citizens the police protection due them. In short, if it should be found that the police are gathering information which they could not reasonably believe to be relevant to the police function, detectional or preventive, and that circumstances warrant judicial intervention on that account, the injunctive order must be precisely limited to the offending material or practice. The

order must not interfere with police activity that is proper, either in direct terms or because of the vagueness of the restraint.

The judgment is reversed and the matter remanded for further proceedings not inconsistent with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.

## ADDENDUM

### APPENDIX G

INSTRUCTIONS FOR PREPARING THE SECURITY INCIDENT REPORT, SP FORM 420, AND CONTINUATION PAGE, SP FORM 420A.

The numbers on the Security Incident Report, SP Form 420 and continuation page, SP Form 420A, have been inserted to simplify filling out the report. They correspond with the following numbers and titles:

1. *Department or Agency* — Enter Department or Agency reporting.
2. *Case Number* — Type Case Number, if applicable.
3. *Reference Number* — Leave Blank.
4. *Anticipated Incident* — Check box if reporting an anticipated incident.
5. *Incident in Progress* — If reporting on an incident still in progress, check box.
6. *Incident Completed* — Check box if reporting an incident that has occurred.
7. *Date or Dates* — Enter date of incident. Use numbers for month, day and year. If incident is anticipated, include expected date. In reporting incident spanning several days, list date started and date ended.
 *Examples*: 8–4–68 to 8–7–68

8. *Time* — If the exact time of the incident is known, type the time. Use "AM" and "PM". In reporting incident covering several hours, list time started and time completed.
 *Example*: 10:00 a.m. to 2:00 p.m.
9. *Type of Incident* — Enter the type of incident. *Examples*: Civil disturbance, riot, rally, protest, demonstration, march, confrontation, etc.
10. *Location* — Type the location of the incident. If business or residence, the number and name of street, road, lane or avenue. If open area, give approximate distance to a known geographical location.
11. *Reason or Purpose of Incident* — Enter reason for incident or alleged purpose.
12. *Number of Participants* — List estimated or announced number of participants or anticipated participants.
13. *Organizations and/or Groups Involved* — Give full names and addresses of organizations and/or groups involved. If more space is needed, use Narrative.
14. *Leaders* — Enter names, addresses and titles, if any, of leaders of organizations and/or groups involved. Include nicknames, aliases, and other identifying data.
15. *Evaluation of Source* — Evaluate the source by checking the box which most nearly describes the informant:
 Completely Reliable
 Fairly Reliable
 Unreliable
 Reliability Unknown
16. *Evaluation of Information* — Evaluate information by checking the box which most nearly describes the contents:
 Confirmed by Other Source
 Possibly True
 Improbable
 Cannot be Judged
17. *Narrative*
 a. Information previously included elsewhere on this report need not be repeated in the Narrative.

b. If an organization and/or group is involved in the incident reported, include type and how involved.

*Examples of types*: Left wing, Right wing, Civil Rights, Militant, Nationalistic, Pacifist, Religious, Black Power, Ku Klux Klan, Extremist, etc.

*Examples of How Involved*: Sponsor, co-sponsor, supporter, assembled group, etc.

c. Use this section to furnish additional information.

d. If additional space is required, use Continuation Page, SP Form 420A.

18. *Reporting Date* — Type date this report was prepared using numbers for month, day and year.

19. *Name* — Type rank and name in block. (Sign above block).

20. *Badge Number* — Type badge number in block, if any.

21. *Page of Pages* — May be filled in with ball point pen when report is completed.

**234** 

 

STATE OF NEW JERSEY SECURITY INCIDENT REPORT

| (1) DEPARTMENT OR AGENCY | | | (2) CASE NUMBER | | (3) REFERENCE NUMBER |
|---|---|---|---|---|---|

| (4) ANTICIPATED INCIDENT | (5) INCIDENT IN PROGRESS | (6) INCIDENT COMPLETED | (7) DATE OR DATES | | (8) TIME OR TIMES |
|---|---|---|---|---|---|

| (9) TYPE OF INCIDENT | (10) LOCATION OF INCIDENT |
|---|---|

| (11) REASON OR PURPOSE OF INCIDENT | (12) NUMBER OF PARTICIPANTS |
|---|---|

(13) ORGANIZATIONS AND/OR GROUPS INVOLVED (NAMES – ADDRESSES)

(14) LEADERS (NAMES – ALIASES / NICKNAMES – ADDRESSES)

| (15) Evaluation of Source | COMPLETELY RELIABLE | | FAIRLY RELIABLE | | UNRELIABLE | | RELIABILITY UNKNOWN | |
|---|---|---|---|---|---|---|---|---|
| (16) Evaluation of Information | CONFIRMED BY OTHER SOURCE▪ | | POSSIBLY TRUE | | IMPROBABLE | | CANNOT BE JUDGED | |

(17) Narrative: OTHER FINDINGS AND OBSERVATIONS – INCLUDE PRIOR ACTIVITIES OF ORGANIZATIONS AND OR GROUPS AND SOURCE OF INFORMATION, IF OTHER THAN CONFIDENTIAL.

| (18) REPORTING DATE | (19) NAME | (20) BADGE NUMBER | (21) PAGE OF PAGES |
|---|---|---|---|

NJSP 420 (2–62) MAIL TO: Central Security Unit, New Jersey State Police, Box 68, West Trenton, N.J. 08625

STATE OF NEW JERSEY CONTINUATION PAGE

| (1) DEPARTMENT OR AGENCY | (2) CASE NUMBER | (3) REFERENCE NUMBER |
|---|---|---|

| (16) REPORTING DATE | (19) NAME | (20) BADGE NUMBER | (21) PAGE OF PAGES |
|---|---|---|---|

NJSP 420A

## INSTRUCTIONS FOR PREPARING THE SECURITY SUMMARY REPORT, SP FORM 421.

The numbers on the Security Summary Report, SP Form 421, have been inserted to simplify filling out the report. They correspond with the following numbers and titles:

1. *Department or Agency* — Department or Agency reporting.

2. *Case Number* — Type Case Number, if applicable.
3. *Reference Number* — Leave blank.
4. *Name* — Type full name of person investigated. Include aliases and nicknames.
5. *Address* — Enter complete address of person investigated, include phone number.
6. *Date of Birth* — Type in date of birth of person investigated. Use numbers for month, day and year.
7. *Place of Birth* — Enter city and state or country of birth. Use accepted abbreviations.
8. *Marital Status* — Self-explanatory.
9. *Spouses Full Name* — Type full name of spouse. If wife, include maiden name or names by any other marriages.
10. *Age* — Enter age of person at time of investigation. Use numbers.
11. *Sex* — Type sex. Use M for male and F for female.
12. *Race* — Enter race of person investigated. Use the following guide:
 W for White
 N for Negro
 I for Indian (American)
 C for Chinese
 J for Japanese
 O for Other
13. *Height* — Use numbers
 *Example*: 5–10
14. *Weight* — Use numbers.
 *Example*: 165
15. *Hair* — Self-explanatory.
16. *Eyes* — Self-explanatory.
17. *Complexion* — Self-explanatory.
18. *Occupation* — Enter current occupation.
19. *Employer/Business* — Type in name of employer. If self-employed, enter name and nature of business.

20. *Employer's Address* — Enter address of employer or business, include phone number.
21. *Other Descriptive Information* — List scars, marks, tattoos, physical deformities and/or defects.
22. *Arrest Record* — Enter yes or no.
23. *SBI Number* — Type S.B.I. number, if available.
24. *FBI Number* — Type F.B.I. number, if available.
25. *Other Numbers* — Enter your department or agency, other police or out of state bureau numbers, if available.
26. *MV Record* — Enter yes or no.
27. *Drivers License Number* — Type full driver license number.
28. *State* — Enter name of state issuing driver license.
29. *Social Security Number* — Type Social Security Number, if available.
30. *Associates* — Enter names and addresses of associates, include aliases and nicknames. List additional associates in Narrative.
31. *Vehicle Information* — Enter information on vehicles registered to or used by subject. List additional vehicles in Narrative.
32. *Evaluation of Source* — Evaluate the source by checking the box which most nearly describes the informant: Completely Reliable
Fairly Reliable
Unreliable
Reliability Unknown
33. *Evaluation of Information* — Evaluate information by checking the box which most nearly describes the contents:
Confirmed by Other Source
Possibly True
Improbable
Cannot be Judged
34. *Narrative*
 a. Report on the categories listed in Block 33 which are essential to complete information.

 b. Information previously included elsewhere on this report need not be repeated in the Narrative.

 c. Use this section to furnish additional information.

 d. If additional space is required, use Continuation Page, SP Form 420A.

35. *Reporting Date* — Type date this report was prepared using number for month, day and year.

36. *Name* — Type rank and name in block. (Sign all copies above block.)

37. *Badge Number* — Type badge number in block, if any.

38. *Page of Pages* — May be filled in with ball point when report is completed.

239

STATE OF NEW JERSEY SECURITY SUMMARY REPORT

| (1) DEPARTMENT OR AGENCY | (2) CASE NUMBER | (3) REFERENCE NUMBER |
|---|---|---|

| (4) NAME (ALIASES / NICKNAMES) | (5) ADDRESSES | PHONE |
|---|---|---|

| (6) DATE OF BIRTH | (7) PLACE OF BIRTH | (8) MARITAL STATUS | (9) SPOUSES FULL NAME |
|---|---|---|---|

| (10) AGE | (11) SEX | (12) RACE | (13) HEIGHT | (14) WEIGHT | (15) HAIR | (16) EYES | (17) COMP,N | (18) OCCUPATION |
|---|---|---|---|---|---|---|---|---|

| (19) EMPLOYER / BUSINESS | (20) EMPLOYER'S / BUSINESS ADDRESS | PHONE |
|---|---|---|

(21) OTHER DESCRIPTIVE INFORMATION (ATTACH PHOTO, IF AVAILABLE)

| (22) ARREST REC'D | (23) SBI NUMBER | (24) FBI NUMBER | (25) OTHER NUMBERS |
|---|---|---|---|

| (26) MV RECORD | (27) DRIVER LICENSE NUMBER | (28) STATE | (29) SOCIAL SECURITY NUMBER |
|---|---|---|---|

(30) ASSOCIATES (NAMES — ALIASES / NICKNAMES — ADDRESSES)

(31) VEHICLE INFORMATION YEAR — MAKE — BODY TYPE — COLOR — REGISTRATION NUMBER — STATE

| (32) Evaluation of Source | COMPLETELY RELIABLE | FAIRLY RELIABLE | UNRELIABLE | RELIABILITY UNKNOWN |
|---|---|---|---|---|
| (33) Evaluation of Information | CONFIRMED BY OTHER SOURCE | POSSIBLY TRUE | IMPROBABLE | CANNOT BE JUDGED |

(34) Narrative: CITIZENSHIP / NATURALIZATION DATA — PARENTAL BACKGROUND / OCCUPATION — ARMED FORCES SERVICE / DRAFT STATUS — MEMBERSHIP, AFFILIATION AND/OR STATUS WITH ORGANIZATIONS OR GROUPS — EDUCATION BACKGROUND — HABITS OR TRAITS — PLACES FREQUENTED — PAROLE/PROBATION DATA— DATA ON IMMEDIATE FAMILY — FINANCIAL / CREDIT STATUS — INCLUDE OTHER RECORD OF PAST ACTIVITIES FINDINGS AND/OR OBSERVATIONS

| (35) REPORTING DATE | (36) NAME | (37) BADGE NUMBER | (38) PAGE OF PAGES |
|---|---|---|---|

NJSP 471 -2 68, MAIL TO: Central Security Unit, New Jersey State Police, Box 68, West Trenton, N.J. 08625