**Douglas H. DONOHOE et al., Plaintiffs,**

**v.**

**Frank S. DULING, Chief of Police for the City of Richmond, Virginia, and W. L. Groth, Director of the Department of Safety for the City of Richmond, Virginia, Defendants,**

**and**

**United States of America and Commonwealth of Virginia, Intervening Defendants.**

**Civ. A. No. 300-70-R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 23, 1971.

Seymour DuBow, Robert Pustilnik and Samuel W. Tucker, Richmond, Va., for plaintiffs.

Daniel T. Balfour, City Atty., Richmond, Va., for Duling and Groth.

David G. Lowe, Asst. U. S. Atty., Richmond, Va., for the United States.

Vann H. Lefcoe, Asst. Atty. Gen. of Virginia, Richmond, Va., for Commonwealth of Virginia.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Plaintiffs herein seek a declaratory judgment as to their rights and injunctive relief to prohibit certain police practices in the City of Richmond, Virginia. Specifically, they seek redress, as members of an alleged class, for deprivation of rights secured by the First, Ninth and Fourteenth Amendments to the United States Constitution. For reasons that are obvious from the facts presented, only First Amendment rights will be discussed.

It has long been the policy in Richmond and other places throughout the nation to photograph persons participating in vigils, demonstrations, protests and other like activities, whether peaceful or otherwise. While the demonstration or assembly may be perfectly lawful and peaceable at all times, the responsibility of the police does not stop at this point. Indeed, as one of plaintiffs' witnesses testified, "Some of them have gotten out of hand, rowdy, destroying property," and this witness was only referring to two groups, The Women's International League for Peace and Freedom and the Welfare Rights Organization. As a further illustration of what occurs, the same plaintiffs' witness testified that Loretta F. Johnson, an acknowledged leader of protest groups, had telephoned him in advance to the effect that she would lead a group of welfare people to a store where there would be a "shop-in"—which consists of picking up clothes and charging them to the Welfare Department. In substance, plaintiffs contend that, even with such advance information, the police should not go to the store and take photographs of the participants.

Defendants freely concede that pictures are taken of most demonstration or protest meetings conducted on public property. The discretion as to which meetings are covered is vested in the Chief of Police and those immediately under him. As Chief Duling described it, they cover any meeting that would have the possibility of creating any feeling.

The reasons for this police practice, which apparently constitutes an acceptable police practice throughout the country, are several. In the first place, it is necessary to identify the leaders. Likewise, there are many unknown participants who come into Richmond from other areas, and it is highly important to determine whether these individuals have a record of being dangerous and to what extent they have participated in other gatherings outside of Richmond. Thirdly, the practice serves as a deterrent to violence and vandalism. An additional reason is that it serves to protect the peaceful demonstrators from acts of counterdemonstrators and protesters, such as groups opposing desegregation of schools, theaters and other public facilities, as well as interruptions at picket lines involving labor disputes.

The photographs thus taken by the police are filed by roll number and identified by the particular demonstration or assembly. Individual files are not maintained on all participants, but it is a fair assumption that files are kept on certain leaders of the various groups. Information as to the pictures and files, if any, may be supplied to other federal, state and local law enforcement agencies upon written request of the head of the agency or by a personal visit of the requesting agency to police headquarters. No information is furnished by telephone. Only federal, state and local law enforcement agencies can obtain the pictures and any data so maintained on any individual.

The pictures are not taken secretly. The cameras are plainly visible. Police officers, all appearing in plain clothes, are directed to identify themselves upon request, and they frequently voluntarily disclose their identities in an effort to obtain information as to the identity of the participant photographed.

The witnesses for the plaintiffs argue that the presence of police photogra-

phers has a "chilling effect" upon their presence, as well as on others who may wish to participate. With one or two exceptions it may be safely said that these individuals could not acquire a "chilling effect" if they were locked in a deep freeze. Aside from the court's view as to this point, the mere existence of a "chilling effect" does not justify federal intervention in this case. Although not mentioned in either brief, the most recent pronouncement on "chilling effect" lies in the words of Mr. Justice Black in Younger v. Harris, 401 U. S. 37, 51, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971), where it is said:

> "Moreover, the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute [or police practice] does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute [or police practice] can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so. * * * Just as the incidental 'chilling effect' of such statutes [or police practices] does not automatically render them unconstitutional, so the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the State from carrying out the important and necessary task of enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution."

While Younger v. Harris, *supra,* did not deal with police practices such as here presented, we feel that the foregoing quotation is equally apt, and tends to clarify the ambiguous language in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), so heavily relied upon by the plaintiffs.

Reverting to the facts of the instant case, we note from the evidence that the leaders of these protesting or demonstrating groups always telephoned the news media, including television stations, advising them of the time and place of the particular demonstration. They knew, in taking such action, that photographers would be present to take pictures of the assembled group, especially the leaders. They knew, or could fairly assume, that photographs taken by news and television media are readily available to law enforcement authorities upon request or order of any court. They invited the publicity and must stand the consequences. It is argued that the photographs taken by the police are more identifiable, but this is refuted in part by Loretta F. Johnson who testified that the news media and television cameras concentrated upon the leaders of the movement.

Some of plaintiffs' witnesses indicated that they objected to their pictures being taken by anyone at anytime, although all witnesses stated that they never verbally registered any objection to the police photographers. Others expressed no particular objection to the picture being taken but were fearful of the use of the photographs by the police. Several visualized that all photographs were sent to a National Data Bank or other like groups. No witness ever actually endeavored to ascertain the true facts as to the use of the pictures and the extent of any filekeeping on individuals who appeared in the pictures.

While we express grave doubts that any witness, participant, or potential participant could actually be inhibited in his First Amendment rights—even if we accept the far-fetched argument that some few persons may be so affected—it is obvious that the effect is minor in relation to the need for control of conduct and the lack of alternative means for so doing. The knowledge that police are present at any demonstration and that

photographs are being taken tends to curb acts of violence, rowdyism, and the destruction of property. Most assuredly, reporters, press photographers and television cameramen are not interested in deterring demonstrators, protestors and the like. To the contrary this is what the news media likes, and it is the potential that disturbances may occur which draws the news media to the scene.

We hold that the practices of the Richmond police as heretofore described are not only permissible and constitutional, but they are also commendable and should be encouraged. While not in this record, it is a matter of common knowledge that many of the so-called lawful, peaceful demonstrations suddenly erupt into acts of violence which result in damage to property and person with occasional death. A preventive practice on the part of the police is far better than attempting to cure the evil after the act has been completed. The responsibility to prevent crime is as great as the duty to solve the crime and arrest the offender.

All parties rely upon a New Jersey decision as being closest in point of fact. Plaintiffs urge the adoption of the reasoning of the Superior Court of New Jersey, Chancery Division, Hudson County, in Anderson v. Sills, 106 N.J.Super. 545, 256 A.2d 298 (Ch.Div.1969), in which an attack was made upon a suggestive memorandum issued by the Attorney General of New Jersey urging the use and maintenance of Security Summary Reports and Security Incident Reports in matters involving *potential* civil disorders. On cross-motions for summary judgment the trial court, rather amazingly, granted relief to the plaintiffs and issued an injunction against the Attorney General. On appeal, in an exhaustive opinion by Chief Justice Weintraub, the Supreme Court of New Jersey reversed. Anderson v. Sills, 56 N.J. 210, 265 A.2d 678 (1970). While it is true that the case was remanded for an evidentiary hearing, the persuasive language of the higher court was sufficient to put to rest the contentions of the disgruntled plaintiffs.

We see no need to prolong this opinion by reviewing all of the authorities cited in Anderson v. Sills, *supra,* or indeed in the briefs filed herein. There is no evidence of photographing private meetings of individual groups as was condemned in Local 309, etc. v. Gates, 75 F.Supp. 620 (N.D.Ind.1948). There were no arrests made or attempted for participation in a lawful activity as proscribed in Bee See Books, Inc. v. Leary, 291 F.Supp. 622 (S.D.N.Y.1968). Surveillance is a perfectly legitimate motive even though it may result in an incidental coercive effect. United States v. McLeod, 385 F.2d 734, 750 (5 Cir. 1967). There is no wholesale dissemination of photographs and files for improper purposes. Menard v. Mitchell, 139 U.S.App.D.C. 113, 430 F.2d 486 (1970). There has been no interference with the use of the streets and other public facilities. Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

This case presents a mass of hearsay testimony as to the feelings of many who did not testify. Loretta F. Johnson specifically named three women who were present at the trial and available as witnesses who purportedly had told her that they could not participate in demonstrations because of police photography. The three women were not called as witnesses.

The alleged fears of plaintiffs' witnesses were so obviously without foundation that they reached a high point where William Evans, a law student at the University of Richmond, testified that he was on his way to hear a speaker by the name of Allen Ginsberg at Virginia Commonwealth University when, in looking for a place to park his automobile, he saw a police car ride past. For this reason he went home and, according to his statement, has not attended a public assembly since that date.

■ The fears of these plaintiffs and their witnesses are the product of rumor, ignorance, distrust and an organized desire to disrupt police activity. The fears are imaginary and for the sole purpose of a sponsoring organization which is attempting to impede the legitimate efforts of police authorities in protecting the citizens and public welfare. As the Supreme Court of New Jersey so aptly put the question in Anderson v. Sills, *supra*, when discussing the chilling effect of police activity—

"[T]he critical question is whether that activity is legal, and although the amount of 'chill' might in a given case be relevant to the issue of legality, the fact of the 'chill' is not itself pivotal. Indeed, the very existence of this Court may 'chill' some who would speak or act more freely if there were no accounting before us for trespasses against others. But government there must be, for without it no value could be worth very much. The First Amendment itself would be meaningless if there were no constituted authority to protect the individual from suppression by others who disapprove of him or the company he keeps. Hence the First Amendment rights must be weighed against the competing interests of the citizen." 265 A. 2d 687.

■ While the foregoing disposes of the case, we think it important to mention that, in pretrial proceedings, plaintiffs moved to produce "all files including photographs, reports and notes in possession of the Richmond Police Bureau pertaining to parades, demonstrations, meetings, picketings, and vigils held in Richmond, Virginia from January 1, 1965 to date." They further sought an order to permit them, through their counsel, to enter the premises of the Richmond Police Bureau and to inspect, copy or photograph such documents.

Upon the filing of this motion the United States of America and the Commonwealth of Virginia requested and were granted permission to intervene as parties defendant; the reason being that through cooperation between law enforcement agencies the intervenors were vitally affected. If plaintiffs' motion had been granted, other law enforcement agencies could not entrust the Richmond police with any information.

It must be remembered that, prior to the filing of such an extraordinary motion, defendants had answered and freely admitted the police practice described above.

Following an evidentiary hearing on the motion, counsel for plaintiffs candidly admitted that he wanted to see the police files. In fact, in light of defendants' answer, there could be no other purpose.

We doubt that any more dangerous precedent could be set than to have granted plaintiffs' motion. To permit an attorney, even though an officer of the court, to promiscuously browse through police files would be disruptive of any law enforcement agency. Needless to say, the motion was denied.

For the reasons stated herein, a judgment order will be entered denying the relief sought by said plaintiffs, dismissing the complaint herein, and assessing costs against the plaintiffs. Counsel for defendants will prepare and present a judgment order after first obtaining the endorsement of one of counsel for the plaintiffs.