**Douglas H. DONOHOE et al., Appellants,**

v.

**Frank S. DULING, Chief of Police for the City of Richmond, Virginia, et al., Appellees.**

**No. 71–1954.**

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1972.

Decided Aug. 1, 1972.

David G. Lowe, Asst. U. S. Atty., for appellees.

Before HAYNSWORTH, Chief Judge, and WINTER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This class action challenges certain practices of the police department of the City of Richmond as infringements upon plaintiffs' freedom of speech and association as guaranteed by the First Amendment and of the constitutional right to be secure in their privacy from unreasonable Government intrusion.[1] The defendants are the Chief of Police and Director of the Department of Public Safety for the City of Richmond.[2] Specifically, the plaintiffs object (1) that police surveillance, and especially the presence and use of police photographers, at demonstrations and other public meetings or vigils, are violative of their First Amendment rights and (2) that the retention in the police files of photographs of persons participating in such demonstrations or attending such meetings is an unconstitutional violation of their right of privacy. They ask for a declaratory judgment that such practices are illegal and for injunctive relief against their continuance. The District Court denied relief[3] and this appeal followed.

The record establishes that the police department of Richmond engages routinely in surveillance, in the form of a uniformed police presence, at public demonstrations and political meetings held on public streets or grounds, that it photographs at least some persons present or participating in such demonstrations or meetings and that it maintains photographs of such participants in its files, which photographs are made available, on request, exclusively to other

Seymour Dubow, Richmond, Va. (Robert A. Pustilnik, American Civil Liberties Union of Virginia Foundation, Richmond, Va., on brief), for appellants.

Daniel T. Balfour, Asst. City Atty., City of Richmond, and Vann H. Lefcoe, Asst. Atty. Gen. of Va. (Andrew P. Miller, Atty. Gen. of Va., on brief), and

1. For a perceptive discussion of the constitutional concept of privacy, see Lusky, Invasions of Privacy: A Clarification of Concepts, Political Science Quarterly, June, 1972, p. 192.

2. The Commonwealth of Virginia was permitted to intervene in support of the position of the defendants.

3. Donohoe v. Duling (D.C.Va.1971) 330 F.Supp. 308.

law enforcement agencies.[4] These activities are treated by the defendants as normal police procedure. According to the Richmond Acting Director of the Department of Public Safety, they conform to the "acceptable police practice throughout the country to record demonstrations, both peaceful and otherwise * * *." The reason assigned for the practices by the Acting Director is the "need to know who the leaders (of the demonstrations) are", particularly "those who are coming in from outside of our city". By photographing those who are "from outside of our city", the police authorities, after an exchange of information with "other police agencies, federal, state, local", can determine whether these outsiders "are dangerous, whether they have participated in affairs in other areas where problems have actually developed".[5] The Acting Director expressed the opinion that, "The very fact that the proceedings are recorded on film has a deterrent effect" and "is a deterrent to violence, vandalism, this type of thing".

The classes or types of meetings and demonstrations covered by this practice of the police department are varied and significantly different in character. Some are public demonstrations conducted on the public streets, where the actual purpose of the demonstrators is to publicize, by their presence and participation, their cause. In keeping with this purpose, the news media, radio, and television are given advance notice of the demonstrations and are invited to send reporters and photographers to cover the demonstrations. At times, it was testified, the police authorities likewise were advised and, it may be assumed, were im-

pliedly invited to be present. Other demonstrations involved what was characterized in the testimony as "shop-ins", a term used to describe the descent of an organized group upon a store, where members of the group pick-up various articles of merchandise and, without paying for the articles, depart, advising the clerk as they depart to charge it to "welfare". It was testified that on at least one occasion, the police authorities were given prior notice by the organizers of one of these "shop-in" demonstrations. A third group of meetings involved in the police action, consisted of public meetings held on the public grounds of the State House or other public property. The exact nature of these meetings was not set forth, but, it seems, they were primarily "anti-war" or "pro-welfare" in their purpose. The only groups specifically identified as participating were the "Women's International League for Peace and Freedom" and the "Welfare Rights Organization". There was testimony that "some of them (the demonstrations or meetings) have gotten out of hand, rowdy, destroying property".

There was a final category of meetings referred to in the record. These were held in a local church. They were open to the public and the programs would generally embrace a speech on a controversial political subject under the sponsorship of an organized group. The police department properly considered this group of meetings differently from the other three. It did not attempt to have observers present at such meetings, presumably because the meetings, though public, were on private property. It did, though, station a photographer, at times on the sidewalk, at other times in a car

4. There is no legislative authorization for any of such practices nor are there precise administrative regulations governing the procedures to be followed. The author of the note in 58 Cal.L.Rev. 914, at p. 928, titled "Preventive Intelligence Systems and the Courts", indicates that authorization for such practices should be legislatively given. Cf., however, Anderson v. Sills (1970) 56 N.J. 210, 265 A.2d 678, 684.

5. Compare, Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154, where the Army, in connection with its responsibility in cases of public disorder, justified its surveillance because of the necessity of a public awareness of group tensions, what forces exist, the nature and size of discordant groups and the exploding possibilities of such tensions.

on the street opposite the church; and this photographer, so far as practicable, photographed those entering the church.

The defendants raised the threshold question that the plaintiffs are without standing to maintain this action or to represent the class or classes allegedly adversely affected by the practices of the police department. Specifically, they deny that the plaintiffs have sustained any injury or realistic threats to their rights. The record includes no testimony from any plaintiff other than the plaintiff Donohoe. And Donohoe, it developed, had no complaint against the defendants. He was a student at Virginia Commonwealth University in Richmond. While attending a meeting on the campus of that institution, he observed officers maintaining surveillance of the meeting and was photographed by them as he entered the meeting. The officers, however, were not connected with the Richmond police department and were not under the direction or control of the defendants; they were security officers employed by the university. It is true the defendants conceded the surveillance of certain demonstrations and public meetings. They, also, admitted that photographs were taken of persons attending such meetings or participating in demonstrations. Pictures of two of the plaintiffs had been taken while they were participating in demonstrations. But the defendants denied that any of the plaintiffs had been inhibited in the exercise of their First Amendment rights by any action on their part; and no plaintiff testified to the contrary. In particular, to restate: there was a complete absence of testimony that any of the plaintiffs had ever sustained any "specific present objective harm" or had ever been personally restrained, or "chilled"[6] in the exercise of his or her First Amendment rights.

At the outset of the action, it is true, the plaintiffs had moved for a temporary restraining order, and in connection with that motion, had filed their affidavits. Of course, these affidavits, never incorporated in the testimony, cannot be a basis for a finding of standing to sue. Even if they were available for this purpose, they would be insufficient to establish a justiciable claim on the part of the plaintiffs. In these affidavits, the plaintiffs set forth in detail repeated demonstrations in which they had participated where the police had been present and at which they had either been photographed or had heard of others being photographed. It is manifest from their statements in these affidavits, detailing repeated demonstrations in which they had taken part, that they had not been deterred by the activities of the police authorities from participating in demonstrations or "chilled" in the exercise of their First Amendment rights. In fact, they made no such claim. At best, they asserted that they were "annoyed" or "felt uncomfortable" or "nervous". Accordingly, if the testimony herein be expanded to include the affidavits of the plaintiffs, which represented *ex parte* statements of the parties, untested by cross-examination, there is still nothing in this record to establish harm or injury actually sustained by the plaintiffs themselves.

The plaintiffs did present testimony from others on the practices of the Richmond police department. These witnesses were not intervenors in the action and their complaints would not uphold a justiciable claim on the part of the plaintiffs. Even had they intervened, their testimony would not establish that their First Amendment rights had been

6. The term "chilling effect", as used in analyzing challenges under the First Amendment, was introduced first into legal terminology by Justice Frankfurter in his concurring opinion in Wieman v. Updergraff (1952) 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216. In his concurring opinion in Zwickler v. Koota (1967) 389 U.S. 241, 256, n. 2, 88 S.Ct. 391, 19 L.Ed.2d 444, Justice Harlan describes this "chilling effect doctrine" as "ubiquitous and slippery" and as "amorphous".

"chilled" by the action of the Richmond police authorities. None of these witnesses, by their own testimony, had been, either directly or apparently even subconsciously, deterred in the exercise of their First Amendment rights by the action of the defendants nor had they suffered any specific injury. Two of the witnesses were leaders in organizing demonstrations. They frankly conceded that nothing the Richmond police authorities did induced them to desist from their prominent roles in public demonstrations or meetings. They did not object to being photographed; to the contrary, they solicited publicity both for their meetings and for themselves by inviting representatives of the news media, including photographers, to be present and to report, with photographs, the demonstrations and meetings.[7] Their only complaint was that others were not as forthright or courageous as they; they claimed the right to speak for these more timorous individuals.[8] And they endeavored to establish the existence of, and to identify, the more timorous by testifying that, when they offered a handbill to some passers-by, the handbills were refused or taken diffidently. These refusals or this diffidence the witnesses subjectively attributed, not to unfriendliness to their cause or even disinterest, but to an apprehension generated by the presence of the police at the demonstration. They, also, claimed that some persons had been frightened from participating in demonstrations by this police presence. Three persons present in court and identified by name were stated to have indicated that they were so deterred. It is significant though, that no one of these three supported this claim with their testimony. Another witness for the plaintiffs testified that he had intended to attend a public meeting but, on his way to the meeting, passed a police car, the sight of which prompted such fear in him that he did not drive on to the meeting. Another witness simply objected to having his picture taken at all; in fact, he indicated he would refuse to have his picture affixed to his driver's license, even though required by State law. One witness was the minister at the church where a public meeting was held. He was not photographed, so far as the record shows, and certainly was not intimidated. He objected to a police car parked on the street opposite the church, where those attending the meeting were observed, in some instances, being photographed, with presumably long-distance lenses. Finally, there was testimony that, in offering a reply to a complaint filed by a post office employee claiming discrimination in promotion and prejudice on the part of the local postmaster, the local postmaster had reported that the FBI had told him the employee had participated in a demonstration. There was no evidence that the FBI had actually secured this information from the Richmond police department, though it was proved that the files of that department were available to the FBI. It is common knowledge though, that the FBI maintains its own surveillance of demonstration groups and it is just as reasonable to assume it may have acquired knowledge of the employee's participation from its own surveillance as from that of the Richmond police department.[9]

7. Accounts of their activities were available in newspaper files.

8. Their position is similar to that of the plaintiffs in Laird v. Tatum. In that case. it was stated (408 U.S. at p. 13, 92 S.Ct. at p. 2326, n. 7):

> "At the oral argument before the District Court, counsel for respondents (the plaintiffs) admitted that his clients were 'not people, obviously, who are cowed and chilled'; indeed, they were quite willing 'to open themselves up to public investigations and public scrutiny'. But, counsel argued, these respondents must 'represent millions of Americans not nearly as forward (and) courageous' as themselves."

9. Section 534(a) (1), 28 U.S.C., authorizes the FBI to classify and preserve "identification, criminal identification, crime, and other records" and to exchange such "with, and for the official use of" federal, state or municipal law enforcement officers. See, also, Menard v. Mitchell (D.C.D.C.1971) 328 F.Supp. 718.

At any rate, there was no evidence that this information prejudiced the employee in any way in the disposition of his complaint. Moreover, this employee was not a plaintiff.

Laird v. Tatum, decided June 26, 1972, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154, makes clear, that on this record (even if expanded to include the affidavits of the plaintiffs filed in connection with their preliminary motion) the plaintiffs are without a justiciable claim for relief and that the District Court correctly dismissed the action. In that case, the plaintiffs "were targets of the Army's surveillance".[10] As we have already indicated, that "surveillance" went far beyond the extent of "surveillance" in this case. It was clandestine, not open. It employed not merely photographers but resorted to sophisticated electronic methods of surveillance. It involved infiltrating meetings with secret agents and photographers.[11] The information collected was "distributed to civilian officials in state, federal, and local government * * are (were) stored in one or more data banks." In this case, on the other hand, no plaintiff—for that matter, no witness—was subjected to clandestine surveillance. The photographer was no counterfeit news photographer; he was openly identified as a police officer and known by the demonstrators as such. Indisputably, the surveillance in Tatum was far more pervasive and open to attack than that involved here. Moreover, the right of the Army to engage in domestic surveillance was considerably less clear than that of the local police authorities, such as the defendants here, on whom there is a specific obligation to maintain domestic law and order.

In determining justiciability under the circumstances of Tatum, the Court emphasized at the outset that, the "chilling" effect of executive actions, falling short of a direct restraint of First Amendment rights, would not give rise to a justiciable cause if it arose, "merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual". (Italics in opinion) (408 U.S. p. 11, 92 S.Ct. p. 2324) To the contrary, it observed that in the cases where relief had been granted, "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging". Quoting from Ex parte Levitt (1937) 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493, the Court pointed out "that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action * * *."[12] The opinion proceeded to identify specific injuries which in earlier decisions, had involved[13] personal and specific harm suf-

---

10. See 408 U.S. 16, 92 S.Ct. 2327 (dissenting opinion, Justice Douglas). This is confirmed in the opinion below where the Court said (444 F.2d at p. 954, n. 17):

"The record shows that most if not all of the appellants and/or the organizations of which they are members have been the subject of Army surveillance reports and their names have appeared in the Army's records."

11. See 408 U.S. 16, 92 S.Ct. 2327 (dissenting opinion, Justice Douglas).

12. See, also, Kansas City, Mo. v. Williams (8th Cir. 1953) 205 F.2d 47, 51, cert. denied 346 U.S. 826, 74 S.Ct. 45, 98 L. Ed. 351, quoted in the dissenting opinion in 444 F.2d at p. 961.

13. These involved restraints upon right to practice law (Baird v. State Bar of Arizona, 1971, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639), loss of employment (Keyishian v. Board of Regents, 1967, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629), and personal burden (Lamont v. Postmaster General, 1965, 381 U.S. 301,

ficient to sustain justiciability. Specifically, *Tatum* held that there must be "a claim of specific present objective harm or a threat of specific future harm" in order to support a justiciable claim for relief in a case of this type. "Allegations of a subjective 'chill' " will not suffice. Nor may a plaintiff base his right to sue on injury to another. Quoting from Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (filed 1972, note 7,) Chief Justice Burger stated that "a litigant 'has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others.' "

■ The plaintiffs in this case, undeterred by any action by the defendants and offering no testimony of "injuries done to him (them)",—of any inhibiting of their own exercise of the rights of free speech, of any penalty imposed on them which could be attributed to their exercise of their First Amendment rights, of any loss of employment or even reasonably foreseeable threat of such, of any threat of prosecution, or specific, identifiable civil sanction,—seek primarily in this action to vindicate the alleged rights of others, whose actual intimidation or injury is purely conjectural and speculative, without any positive proof in support. As the Court observed in *Tatum*, this case represents no more than a claim by the plaintiffs that "the exercise of his (their) First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental pur-

pose" (408 U.S. at p. 10, 92 S.Ct. at p. 2324) and, as in *Tatum*, the plaintiffs are "not people, obviously, who are cowed and chilled" by such activity. They are without a justiciable claim.

Affirmed.

WINTER, Circuit Judge (dissenting):

I do not agree that Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (June 26, 1972) should lead us to conclude that on this record plaintiffs have no justiciable claim. Rather, I would conclude that they have standing to sue and that they have proved a cause of action entitling them to relief.

**I.**

The starting point in my discussion is to consider what *Tatum* held, the factual basis on which the decision was reached,[1] what this record establishes, and whether *Tatum* is applicable. *Tatum* concluded that plaintiffs' complaints about the Army's data gathering system failed to present a justiciable controversy. Stated otherwise, plaintiffs lacked standing to litigate the issues they sought to raise because they neither alleged nor proved objective harm or threat of specific future harm to themselves or the class they purported to represent. The factual basis on which the majority decided the case is best documented by quotations from the majority's opinion:

(a) In describing the history of the litigation, the majority said, with reference to the grant of certiorari:

We granted certiorari to consider whether, as the Court of Appeals held,

---

85 S.Ct. 1493, 14 L.Ed.2d 398), to which might be added, harm such as involved in criminal sanctions (Gibson v. Florida Legislative Comm., 1963, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929) and threat of criminal prosecution (Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22).

1. The majority bolsters its interpretation of *Tatum* by reference to the dissenting opinion of Mr. Justice Douglas and the

majority opinion of the Court of Appeals which the Supreme Court reversed. I cannot read the separate opinions in the Supreme Court to proceed on an interpretation of the record accepted by both the majority and the dissenting justices. In such circumstances, I would think it axiomatic that the holdings of the majority must be deemed to relate only to the majority's reading of the record and not to extend to the dissenters' differing interpretation.

respondents presented a justiciable controversy in complaining of a "chilling" effect on the exercise of their First Amendment rights where such effect is allegedly caused, not by any "specific action of the Army against them, [but] only [by] the existence and operation of the intelligence gathering and distributing system, which is confined to the Army and related civilian investigative agencies." 444 F.2d 947, 953. We reverse. (p. 3, 92 S.Ct. p. 2320.)

(b) In describing the district court's and court of appeals' decisions, the majority said:

> It was the view of the District Court that respondents failed to allege any action on the part of the Army that was unlawful in itself and further failed to allege any injury or any realistic threats to their rights growing out of the Army's actions.
>
> In reversing, the Court of Appeals noted that respondents "have some difficulty in establishing visible injury." They
>
>> "freely admit that they complain of no specific action of the Army against them. . . . There is no evidence of illegal or unlawful surveillance activities. We are not cited to any clandestine intrusion by a military agent. So far as is yet shown, the information gathered is nothing more than a good newspaper reporter would be able to gather by attendance at public meetings and the clipping of articles from publications available on any newsstand." 444 F.2d at 953.
>
> The court took note of petitioners' argument "that nothing [detrimental to respondents] had been done, that nothing is contemplated to be done, and even if some action by the Army against [respondents] were possibly foreseeable, such would not present a presently justiciable controversy." (Footnote eliminated.) (p. 9, 92 S.Ct. p. 2323.)

(c) As footnote 5 to its description of the proceedings in the district court, the majority quoted from the record:

> In the course of the oral argument, the District Judge sought clarification from respondents' counsel as to the nature of the threats perceived by respondents; he asked what exactly it was in the Army's activities that tended to chill respondents and others in the exercise of their constitutional rights. Counsel responded that it was
>
>> "precisely the threat in this case that *in some future civil disorder* of some kind, the Army is going to come in with its list of troublemakers . . . and go rounding up people and putting them in military prisons somewhere." (Emphasis added.)
>
> To this the court responded that "we still sit here with the writ of habeas corpus." At another point, counsel for respondents took a somewhat different approach in arguing that
>
>> *"we're not quite sure exactly what they have in mind* and that is precisely what causes the chill, the chilling effect." (Emphasis added in original.) (p. 9, 92 S.Ct. p. 2323).

(d) In an overall characterization of the decision by the court of appeals, the majority said:

> Our examination of the record satisfies us that the Court of Appeals properly identified the issue presented, namely, whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose. We conclude, however, that, having properly identified the issue, the Court of Appeals decided that issue incorrectly. (p. 10, 92 S.Ct. p. 2324.)

(e) In distinguishing prior decisions that held that constitutional violations

may arise from the "chilling" effect of governmental regulations falling short of a direct prohibition against the exercise of first amendment rights, the majority said:

> In none of these cases, however, did the chilling effect arise merely *from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that,* armed with the fruits of those activities, *the agency might in the future take some other and additional action detrimental to that individual.* Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging. (Emphasis added.) (p. 11, 92 S.Ct. p. 2324).

(f) In further discussion of why the authorities distinguished in (e) were not applicable, the majority added:

> The decisions in these cases fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights. At the same time, however, these decisions have in no way eroded the
>
> > "established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action . . ." Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). (p. 13, 92 S.Ct. p. 2325.)

(g) Finally, in articulating the essence of its holding, the majority said:

> Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or

a threat of specific future harm; "the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." United Public Workers v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). (pp. 13–14, 92 S.Ct. p. 2325.)

From these quotations from *Tatum,* it should be at once apparent that *Tatum* was decided by the majority of the Supreme Court on the premise that none of the plaintiffs alleged or tendered any proof to show any harm to himself or any violation of his constitutional rights. The instant case is far different. A précis of the relevant testimony of record is attached as an appendix to this opinion. Three witnesses (Mrs. Hasegawa, Mrs. Johnson, and Christopher Melvin) and arguably a fourth (Mr. Donohoe) were photographed by the police, without their permission and inferably against their will, while they were engaged in the peaceful exercise of their first amendment right to assemble and, in the case of Mrs. Hasegawa and Mrs. Johnson, to petition their government for a redress of their grievances, and in the case of Mrs. Hasegawa, to communicate the ideas she advocated to others. Proof was offered that others were photographed while they were exercising their first amendment right to assemble and that they objected to the invasion of their privacy. Messrs. Evans and Riddick and, arguably, Christopher Melvin, testified that they declined to exercise their first amendment right to assemble after they became aware of the practice of the Richmond police to take photographs at certain peaceful public gatherings. There was evidence that others declined to exercise their first amendment right to assemble and petition their government for a redress of their grievances after they had once had the experience of being photographed by the Richmond police. While in *Tatum* there was only knowledge of surveillance or fear of the consequences of surveillance, here there was actual exposure to the challenged police methods. In short, if photographing on the part of the po-

lice constituted an impermissible violation of constitutional right, there was an abundance of proof that actual harm and an actual violation of rights had occurred. I can only conclude that *Tatum* is distinguishable and hence not a precedent which is controlling.

## II.

Although the record in this case unquestionably establishes a "chilling effect" on first amendment rights,[2] it is equally clear that unlike earlier cases dealing with "chilling effect," the real and actual threat of legal or criminal sanctions, loss of economic benefit, government compulsion to testify or identify one's self, or the threat of publicity, was not proved. See, e. g., United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (criminal prosecution); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (compelling affirmative act of requesting delivery of mail thought by the Post Office to be communist propaganda); Hentoff v. Ichord, 318 F.Supp. 1175 (D.D.C.1970) (publication of a list of those persons belonging to radical organizations who receive honoraria for college appearances.) Moreover, there is no allegation that, aside from the constitutional challenge, the police are not authorized to conduct investigations, including the use of photography, of persons who have not committed a crime. United States v. McLeod, 385 F.2d 734, 750 (5 Cir. 1967).

Thus, the determinative issue in this case is not the existence of the chill, but the quantum of chill in the light of the surrounding circumstances. Cf. Anderson v. Sills, 56 N.J. 210, 265 A.2d 678 (1970). In the present case the defendants are attempting to regulate the disruptive non-speech element inherent whenever numbers of people congregate together, i. e., possible violence. In determining what governmental actions are permissible in the regulation of acts which may be associated with or arise out of the exercise of first amendment rights, the court in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) set forth the following criteria:

> [G]overnment regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; *and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.* (Emphasis supplied.)

391 U.S. at 377, 88 S.Ct. at 1679. Similarly, in Younger v. Harris, 401 U.S. 37, 51, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971), it was said:

> Where a statute [or police practice] does not directly abridge free speech but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute [or police practice] can be upheld *if the effect on speech is minor in relation to the need for control and the lack of alternative means for doing so* . . . (Emphasis supplied.)

See also New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In dismissing plaintiffs' complaint, the district court justified the practice of the police on the grounds that it (1)

---

2. In argument, the Assistant Attorney General, appearing for the commonwealth, conceded that the actions of the police had a "chilling effect" on plaintiffs' first amendment rights. He asserted however that plaintiffs were "unreasonably" chilled, i. e., that plaintiffs were hypersensitive to chill, or that the legitimate objectives of the police outweighed the violation of plaintiffs' rights. The concession was a proper one. Anonymity is an important aspect of first amendment rights because "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." Talley v. California, 362 U.S. 60, 65, 80 S.Ct. 536, 539, 4 L.Ed.2d 559 (1960).

allows the police to identify demonstration leaders; (2) permits the police to identify unknown persons from outside the Richmond area who are participating in the demonstration and who have records of being dangerous; (3) deters violence and vandalism; and (4) serves to protect the demonstrators from counter-demonstrators. I am not persuaded that these objectives are furthered by the present police practice or, if they are, that the same results cannot be obtained with less interference to first amendment rights.

If it is assumed that there is a legitimate reason for recording the identity and likeness of those who lead others in the peaceful exercise of their first amendment rights, there is no reason why police must engage in wholesale photographing of a demonstration in order to obtain pictures of its leaders. In most instances the leaders are known, if not by the fact that they have applied for a permit for the demonstration, then by the fact that they are at the front of the crowd or giving a speech. Moreover, their identity is usually readily ascertainable from the local news media. I conclude that there is no justification for intimidating all the participants in a demonstration in order to obtain pictures of its leaders.

The court's second reason for justifying the present practice is that it allows the police to identify "unknown participants who come into Richmond from other areas" who have a record of being dangerous. It is unclear how the Richmond police photograph unknown persons if they lack knowledge of whom to photograph. I cannot suppose that every time a picture is taken of an unknown person it is sent to the FBI in order to determine whether that person is dangerous. The defendants do not claim that this is the practice; but if it were, it would appear to be a useless tool in controlling the crowd on the day of the demonstration. Certainly it is permissible for the police to take pictures of persons who have violated the law and thereafter send those pictures out to other locales to help

local officials in controlling future demonstrations involving those persons. And the police in Richmond would certainly be justified in receiving photographs from other jurisdictions of individuals who have been found to be dangerous in order to be prepared for their presence in a local demonstration. But this still does not explain how the Richmond police take pictures of dangerous persons who are unknown. I find this asserted rationale specious.

The third and fourth rationales for the present police practice are that it serves to deter violence and vandalism and that it protects the demonstrators. The simple answer to these is that the presence of uniformed police without cameras also deters crime and violence. More importantly, a demonstrator's concept of a policeman who lines the parade route or stands behind the crowd during a speech is very different from that of a policeman snapping pictures of him. In the former case, the policeman is clearly there to preserve order and generally for his protection, while in the latter he takes on more of an adversary role. If a crime is committed those policemen on hand will be in a position to apprehend the violator and at that time they may photograph him. But, until that time, it would seem that indiscriminate photographing, as such, would have little value in deterring crime or apprehending a criminal. While the police objectives are laudable, they can still be obtained without injecting fear into persons who are peacefully exercising their first amendment rights. Although the defendants contend that the plaintiffs' fears and suspicions are unfounded, nevertheless, the fact remains that they do exist; and it appears that the police would lose little of their effectiveness if they abandoned these practices and adopted less offensive ones.

Finally, Anderson v. Sills, supra, cited by the police and relied on by the district court, is distinguishable. For one, the New Jersey Supreme Court, in *Anderson*, reversed the lower court's award of summary judgment on the grounds that the

record was inadequate for a decision on the merits. Anderson v. Sills, supra, 265 A.2d at 681. The court stated that there was no evidence that participation in a rally, protest, demonstration, or march would precipitate any police record. Second, unlike the present case, the court in *Anderson* noted that the individual plaintiffs had not claimed that they had been deterred in the exercise of their first amendment rights. There was only one reference to the photographing of an individual and in that case the court specifically noted that the police had disclaimed any knowledge of the incident. Third, the intelligence gathering procedures in *Anderson* were directed at disorder and they appear to serve a more substantive function than the random photography employed by the Richmond police. Finally, the court in *Anderson* acknowledged that some of the information sought to be obtained might, after an evidentiary hearing, turn out to be irrelevant to the police objectives and indicated that should this be the case the practice could be enjoined.

## III.

This case is reminiscent of an event which occurred in Baltimore shortly after the State of Maryland enacted the Subversive Activities Act of 1949 during the Joe McCarthy era. The Assistant Attorney General in charge of enforcement of the Act directed his investigators to conduct surveillance of a meeting of the World Federalists which was held in a theatre rented for that purpose. Photographs of persons attending the meeting were taken and the license numbers of vehicles in which persons travelled to the meeting were recorded. Subject to this treatment were many prominent members of the Baltimore community.

A vigorous press gave widespread publicity of what had occurred to those who did not attend the meeting and had no direct knowledge of the photographing and the recording of licenses. Aroused public opinion and an enlightened Attorney General quickly prevented a repetition of what had been done.

To me it is regrettable that in this case litigation has been necessary. Plaintiffs have established that the present practice of indiscriminately photographing participants in lawful assemblies has a chilling effect on first amendment rights; defendants have failed to show that their legitimate objectives cannot be achieved in a less offensive manner. I would, therefore, have no hesitancy in reversing the district court and remanding the case for appropriate equitable relief, including enjoining the photographing practices of the police where an actual or imminent violation of law had not occurred and the destruction of all photographs except those of persons who had committed a violation of law. Cf. Bee see Books, Inc. v. Leary, 291 F.Supp. 622 (S.D.N.Y. 1968).

I respectfully dissent.

## APPENDIX

The witnesses who described their experiences with regard to photographing by the police in Richmond testified as follows:

*Mrs. Marie Hasegawa* was present at several vigils and peaceful protests around the Federal Building and at the Induction Center in Richmond, the purpose of which was to protest American foreign policy in Vietnam. Her picture has been taken by police officers many times from many angles. She was one of the group passing out leaflets, and when people attempting to take a leaflet saw a photographer they would withdraw their hands and not accept the leaflet.

*Mrs. Loretta F. Johnson* participated in a peaceful, orderly demonstration of The Welfare Rights Organization held in March 1970 at the old food stamp distribution center in Richmond. The group of about thirty paraded with signs. Policemen on foot and on motorcycles

carried on surveillance and took countless pictures, some from a distance of only two feet. Some of the marchers covered their faces with posters and some with coats. When Mrs. Johnson tried to organize another demonstration, she met with reluctance on the part of would-be demonstrators to participate because of the previous photographing by police.

*Reverend N. Robert Quirin* is pastor of a church in Richmond, who attended a meeting at a public park to protest the use of federal taxes to continue the war in Vietnam at the expense of domestic programs for the benefit of citizens. Police were present around the park and they took a great number of pictures. Other photographers from various news media were also present and engaged in taking pictures. Proof was tendered that if permitted to testify, Reverend Quirin would testify that some of the persons photographed resented having their pictures taken and made such comments as, "Well, here's big brother again!"

*Reverend William Gold* is the minister of the First Unitarian Church in Richmond, where a meeting for peace was held in 1966. Police were stationed in a car across the street, photographing people who entered the church. The presence of the police caused the trustees of the church to abandon an open pulpit policy permitting any group to use the church facilities for an orderly, peaceful meeting.

*William E. Evans* is a law student who resides in Alexandria, Virginia. He was aware of the practice of the Richmond police in regard to the taking of photographs. On his way to a meeting at which Allen Ginsberg was scheduled to speak, Mr. Evans saw a police car which reminded him of the practice of the Richmond police with regard to the taking of photographs. He concluded not to attend the meeting because of the fear of having his picture taken. The fear arose because he was a law student and might

seek federal employment upon graduation. He did not want an unfavorable dossier or police record to embarrass his chance of employment or subsequent promotion.

*Dr. Joseph H. Riddick, Jr.* attended a peaceful demonstration to protest the Vietnam war on the capitol grounds in Richmond on October 15, 1969. He saw a man, obviously neither a tourist nor a television representative, taking photographs. He skirted behind this man because he did not want his picture taken. He has not attended another meeting because he does not want his photograph in an FBI dossier. He is engaged in an aspect of medical practice which depends in large part on federal grants and he did not wish a photograph capable of misinterpretation in this type of dossier.

*Douglas H. Donohoe* was formerly a student at Virginia Commonwealth University. He went to see a film on the Black Panther Party which was shown on campus. Two policemen took his picture. He declined to go to future meetings in Richmond because he was about to graduate and he did not wish to jeopardize his graduation. While there was proof that the photographing incident to which he testified was carried out by Virginia Commonwealth University security officers and not by the Richmond police, there was proof that Virginia Commonwealth University security officers worked in cooperation with and furnished copies of such photographs to the Richmond police.

*Christopher C. Melvin* is a high school student who went on a peaceful hunger hike to raise money to send to Haiti and to build a child care center in Richmond. He was photographed by the police while on the hike. He thinks that such conduct on the part of the police may reduce participants in future hikes and harm an assembly. He has not, himself, participated in another march or protest since the incident.